IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

UNITED STATES OF AMERICA

v.                                                                    CASE NO. 5:00-cr-00021-SPM-AK

VINCENT L. SMITH,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

    This matter is before the Court on Doc. 245, Motion to Vacate under 28 U.S.C. § 2255, by Vincent L. Smith. The Government has filed its response, Doc. 249, and Defendant has filed a reply. Doc. 250. This cause is therefore in a posture for decision. Having carefully considered the matter, the Court recommends that the motion to vacate be denied.

**BACKGROUND**

    On February 20, 1998, a Complaint was filed charging that Defendant had conspired to possess cocaine base with the intent to distribute. Doc. 1. Elizabeth Timothy was appointed to represent Defendant. Thereafter, the grand jury returned an Indictment to that effect. Doc. 8.

    On August 16, 2000, a Superseding Indictment was issued charging Defendant with one count of conspiracy to distribute fifty grams or more of a mixture or substance containing cocaine base, crack cocaine, and two counts of money laundering. Doc. 16. Shortly thereafter,

Timothy moved to withdraw based on scheduling conflicts, and Barbara Sanders was substituted in her stead. Docs. 17-19, 21, & 22.

Defendant apparently advised the Court that he wished to change his plea to guilty, and a change of plea hearing was set. Doc. 23. Two days later, the Government filed a § 851 notice of enhancement based on Defendant's prior drug convictions. Doc. 26. As scheduled, Defendant appeared for a change of plea but instead orally moved for a continuance of trial, which was granted. Doc. 27. A second change of plea hearing was set, Doc. 29; however, when the parties appeared, Ms. Sanders advised the Court that Defendant "did not want [her] to continue representing him." Doc. 33. Sanders then filed a motion to withdraw and for continuance, stating that the "frustration with the lack of communication has led to a conflict between counsel and client," thereby preventing her from effectively representing Defendant. Doc. 34. Without explanation, the Court denied the motion to withdraw but granted the continuance of trial. Doc. 35.

Thereafter, the Court held a status hearing, and upon her renewal of her motion to withdraw, Sanders was allowed to withdraw from further representation, and Christopher Patterson was substituted in her stead. Docs. 37, 40, & 41. In allowing Sanders to withdraw, the Court noted that counsel's "representation of Defendant has essentially ceased because Defendant has stated that he does not want her to continue representation." Doc. 39. The Court also found that "Defendant has lost confidence in her ability to represent him at trial," and that "the most recent communications...have been unproductive." *Id*.

Mr. Patterson then filed several motions to suppress, which, after hearing, were denied. Docs. 55, 56, 63, & 68. Shortly thereafter, Defendant sent the Court a letter seeking a new

attorney on the grounds that counsel was "not doing his job," was refusing "to file motions on [his] behalf," and was "lying on the motions he filed." Doc. 69. He further stated that he felt "unsafe with Mr. Patterson representing [him] and refuse[ ] to go to trial with Mr. Patterson." *Id*.

On the day trial was scheduled to begin, the Court heard argument on Defendant's request for new counsel, Doc. 72, and subsequently granted the motion for substitution of counsel. Doc. 74. Thereafter, George Blow, Defendant's fourth attorney, entered a notice of appearance. Docs. 76, 77, & 79.

On June 19, 2001, the grand jury returned a Second Superseding Indictment, which added a fourth count for possession of a firearm by a prior convicted felon. Doc. 87. On September 17, 2001, the Court held a status hearing in this case. Doc. 104. The primary issue before the Court on that occasion was the "situation" between Mr. Blow and Defendant "as it relates to continued representation." Doc. 224 at 2. Of importance, the Court asked counsel to "sum up...the extent of your investigation into the facts of this case." *Id*. at 15. Mr. Blow replied:

> Not only in terms, of course, of hearing the defendant's version of events, we have identified a number of witnesses, both individuals that we think are probably government cooperating informants in this case, and as to those, I have researched their background and so forth, and at least as to a couple of them that are in the State of Florida, I have gone and in fact interviewed them. So I know what they're going to be saying.
>
> We have a number of witnesses on the defense side, including some who are incarcerated, and I have interviewed them as well. So we're talking, in terms of people, 15 or so witnesses on each side.
>
> There are these warrants. I have looked at all of these warrants, and I have done my best to explain to Mr. Smith why I feel that...I can't file a motion to suppress. I agree with him in terms of I think there's some problems with some of these warrants, particularly the first one, the underpinning involvements. But, you got

> to get around, first of all, the issue of standing, and then the...homeowner's consent to the search. So it becomes a moot point. And these are legal issues that he doesn't understand.
>
> And it comes down to–and I want the court to understand, Mr. Smith has cooperated with me in anything that's been necessary. He's had some records he wanted me to get. We've gotten those and so forth. So it's gone along all right in that respect. But we have this issue. And as you pointed out to him, I'm kind of caught in the middle. On the one hand, he has something that he wants me to do that he feels is critical to his case, and on the other hand, I'm caught between my obligations to the court that I can't pursue something that I don't think is well founded, either in fact or in law, or in arguing the basis for changing the law.
>
> If the court wants to tell me to do it, I'll be happy to do it. Perhaps the court wants to consider to let him, at least as to this issue, file something pro se. But that's where we are.
>
> But now I do want the court to understand, Mr. Smith has cooperated. There's been no problem there, and but for this I'm prepared for trial.

*Id*. at 15-17.

The Court then stated:

> Mr. Smith, based on the representations that I've heard here today, I find no fault with Mr. Blow's representation of you in this matter. I certainly cannot order him to do something that he rules of professional responsibility mandate that he not do.
>
> We're at the point, though, where the case has to be resolved. And I am going to take his suggestion and allow you to file pro se motions to suppress and any other motions you would like at trial, and the court will consider them.
>
> I'm going to set this case for trial at our next trial term. Once we reach that point, those motions will be resolved prior to that point. Those motions will be resolved by the court.
>
> If at that point you still have this dissatisfaction with Mr. Blow's representation of you, I'll make inquiry and you'll have to decide whether you're going to be you own lawyer and try the case, at which point I'll probably appoint Mr. Blow to be standby and be there if you have any questions of him or need his assistance,

>but...we're on our third lawyer now,[1] and it's time for this matter to be resolved
>and to have a jury decide whether you're guilty or not guilty.

*Id.* at 18-19.

The Court continued trial, and Defendant filed a plethora of motions, Docs. 106-110, 125-126, & 130-133, and sent the Court a letter accusing counsel of "bias." Doc. 134. Shortly thereafter, Mr. Blow moved to withdraw, stating that irreconcilable differences had "arising between the Defendant and counsel that make it impossible for counsel to continue to objectively represent the Defendant's interests in this cause." Doc. 139. Blow advised the Court that since the last hearing, the "divide between counsel and the Defendant has grown wider and has become more vitriolic," including allegations by Defendant that counsel was "in active cooperation with DEA Special Agent Brian McLaurin to insure the Defendant's conviction," that he was conveying privileged communications to the Government, that he had "failed to submit to the Court certain arguments and citations of authority prepared by the Defendant," that he had "failed to produce to the Defendant *Jencks* and *Brady* material," that he had "engaged in 'stunts' to the Defendant's detriment," and that he had "otherwise engaged in 'pathetic and very unlawful' conduct...." *Id.* According to counsel, "it is clear that [Defendant] is laying a predicate, not only for a subsequent post-conviction 2255 proceeding, but also potential Bar complaints and malpractice actions." *Id.* Mr. Blow concluded that although he was fully prepared for trial, his attitude towards Defendant had changed, and that there would certainly be "further allegations as this case progresses." *Id.*

The Court denied all of Defendant's *pro se* motions. Docs. 140-141, 143-145, 147, &

---

[1] As previously noted, Mr. Blow was actually the fourth attorney to represent Defendant but only the third attorney with whom he had a conflict.

*Case No: 5:00-cr-00021-SPM-AK*

161.  Before jury selection, the Court heard brief argument on counsel's motion to withdraw and then addressed Defendant:

> THE COURT: At this stage of the proceedings, we have essentially two alternatives–well, maybe three.
>
> The first alternative is that we proceed to trial with Mr. Blow as your attorney.
>
> The second alternative is that we discharge or grant his motion to withdraw, and you proceed to trial representing yourself.
>
> And the third alternative is that I allow him to withdraw, but I appoint him as standby counsel to be there at the counsel table in case you need to consult with him at any time during these proceedings or during this trial.
>
> If I hear you correctly, it is that you are not desirous of having him discharged as your lawyer.  You're not asking me to discharge him as your lawyer.
>
> THE DEFENDANT: No, I ain't had no–I ain't had no–
>
> THE COURT: You just have certain things you want him to do in terms of calling witnesses and filing a motion to, basically, I guess suppress or dismiss the case.
>
> THE DEFENDANT: Correct, correct.

Doc. 225 at 6-7.  With that said, the Court decided to proceed with trial, holding counsel's motion under advisement.  *Id*. at 7.  At that time, Defendant was allowed to file several other *pro se* motions, Docs. 153-155, which were denied.  Docs. 162-163.

The case proceeded to trial, and the jury returned a verdict finding Defendant guilty on Counts One, Three, and Four, but not guilty on Count Two.  Doc. 165.  Subsequently, counsel moved for a new trial and/or for judgment of acquittal.  Doc. 169.  The Court summarily denied

the motion. Doc. 170. Thereafter, the Court granted Defendant leave to file a *pro se* motion for new trial, Docs. 179-181,[2] which was also denied. Doc. 182.

The Court later filed as an attachment certain objections which Defendant had to the Presentence Report (PSR). Doc. 186. Defendant then moved for leave to file objections to the PSR, to represent himself, and for a continuance of sentencing. Doc. 190 & 191. Though the objections had already been made a part of the court file, the Court denied the motion for leave to file the objections and the motion for continuance and took the motion for self-representation under advisement. Docs. 193 & 194. In preparing the PSR, the probation officer considered Defendant's *pro se* objections and addressed each of them. *See* PSR at 25-30.

Thereafter, Defendant appeared for sentencing. When the Court attempted to take up the motion to proceed *pro se*, Defendant said, "Never mind that motion." Doc. 216 at 2. The Court overruled all objections to the PSR, *id*. at 6-9, and sentenced Defendant to life imprisonment on Count One, 240 months imprisonment on Count Three, and 180 months imprisonment on Count Four, to be served concurrently with each other, and the total sentence to run concurrently with a Georgia state court sentence previously imposed. *Id*. at 10. Mr. Blow immediately filed a notice of appeal and was then allowed to withdraw from further representation. *Id*. at 12-13.

On appeal, Defendant raised four issues: (1) the Court erred by denying Mr. Blow's motion to withdraw and by allowing Defendant essentially to act as co-counsel without making a *Faretta* inquiry, (2) the Court erred in denying Defendant's motion for mistrial when it failed to ensure that he had proper attire for trial and then failed to cure testimony by Government

---

[2]Defendant recently filed a second *pro se* motion for new trial, which was apparently a duplication of the original motion. Doc. 251. It too was denied. Doc. 252.

witnesses who referred to Defendant's "jail uniform," (3) the Court erred in denying the motion for judgment of acquittal on the conspiracy charge as the evidence showed only a buy/sell relationship between Defendant and the Government witness, and (4) *Apprendi* required vacation of the conspiracy conviction because the enhancement for prior convictions was improper. Doc. 244 at 3-4.

As to Defendant's first claim, the appellate court found:

> While Blow and Smith differed in their opinions as to what motions should have been filed with the court, what witnesses should be called, and the questions that should be asked of those witnesses, they were still able to communicate....[B]efore trial began, Smith himself asserted that he wanted to be represented by Blow, thereby suggesting that the two were still able to communicate effectively. Therefore, the district court did not abuse its discretion by allowing Blow's continued representation of Smith.

*Id*. at 4-5.  It further determined:

> [T]he trial record indicates Smith's limited actions at trial did not amount to hybrid representation.  Smith filed *pro se* motions with the court, out of the presence of the jury.  He gave his attorney questions to ask of one witness, but the attorney conducted the examination.  These activities demonstrate Smith took an active role in his own defense, but they do not rise to the level of hybrid representation.

*Id*. at 7-8.

With regard to the second claim, the court held:

> Smith was not compelled to wear the prison attire by the government.  Instead, Smith wore the prison attire because he had failed to obtain other attire before the start of trial.  In fact, after the first day of trial, government counsel loaned Smith counsel's own shirts.  Therefore...the district court did not abuse its discretion in denying Smith's motion for mistrial.  Moreover...due process concerns are implicated only if the clothing is indicative of the defendant's status as a prisoner.  There is no evidence in the record that suggests that Smith's prison attire indicated his prisoner status.  Thus, Smith wearing the prison attire was harmless.

*Id*. at 9-10.  Furthermore, the identification of Smith by the Government witnesses which

referred to his "jail uniform" did not "rise to the level of prejudice necessary to constitute reversible error." *Id*. at 10-11.

As to his third claim, the court found that the evidence was sufficient "to show that Smith knew that he was part of a drug distribution conspiracy, as he remained in the same area to do several transactions during the day and sometimes would front the drugs." *Id*. at 13.  It therefore concluded:  "This arrangement leads to the reasonable inference that [Defendant] had an agreement which went beyond the mere buyer/seller association, thus satisfying the agreement requirement for the conspiracy conviction." *Id*.

Finally, the court rejected Defendant's *Apprendi* argument:  "Because the law is settled in this circuit that the question of prior convictions does not have to be submitted to the jury as an element of offense, we affirm Smith's sentences." *Id*.

The instant motion to vacate ensued.  On this occasion, Defendant raises three claims.  Doc. 245 at 5.  Each will be considered in turn.

## **DISCUSSION**

All three of Defendant's claims raise issues of ineffective assistance of counsel.  Therefore, a review of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697.  The Court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see*

*also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable
> courses of defense (that the lawyer did not think of at all) existed and that the

>lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

In his first allegation that Mr. Blow rendered ineffective assistance of counsel, Defendant charges that counsel failed "to prepare a defense that [he] was not a drug dealer or money launderer," but instead was "a known gambler." Doc. 245 at 5. More specifically, Defendant maintains that counsel failed to offer any explanation or evidence "of the excess money always in [Defendant's] possession" or to introduce into evidence a "governmental tax voucher, check stubs, and a $65,000...gift from [Defendant's] father." *Id*. Attached as support for this claim is

*Case No: 5:00-cr-00021-SPM-AK*

an unsigned 1997, 1040 tax return, listing $22,000.00 in "Gambling Winnings" and $10,821.00 in unidentified self-employment business income, prepared by Scofield, Scott & McKinney, P.A. Doc. 245, Attach.

On the second day of trial, counsel objected to the introduction of numerous documents found in the kitchen of Katrina Hull's apartment indicating Defendant's alleged involvement in large money transactions while also showing that Defendant was unemployed. In counsel's view, the Government wanted to use these documents to establish not only Defendant's relationship to the apartment but also his guilt on the money laundering charges. *See*, *e.g*., Doc. 226 at 238-40. Furthermore, there was testimony from Ms. Hull, Defendant's ex-girlfriend, establishing that he was employed and that he was getting his money from his father, who "had won a lawsuit." *See* Doc. 227 at 400-01 & 408. She also told the jury that when she asked Defendant how he could afford to buy cars and go on vacation, he told her that he had bought the automobiles using insurance proceeds from a car wreck and money from his parents. *Id*. at 427-28.

On cross-examination, Mr. Blow specifically asked Ms. Hull about Defendant's gambling, and she admitted that she and Defendant had been on a few "gambling junkets" to the casinos in Biloxi, Mississippi, and that she knew he had won money on those trips. *Id*. at 430-31.

Counsel also questioned Ms. Hull about the source of the money used to pay her bills:

Q.   Now, you indicate that you had to put all your checks into his account, that was his method of operation?

A.   Yes, sir.

> Q. And then he paid you or paid for the bills and so forth, right?
>
> A. Yes, sir.
>
> Q. So, in fact, all or part of whatever was being paid for your bills came from your contribution to the household account, right?
>
> A. Yes, sir.

*Id*. at 433.  He then showed her two checks from Grand Casinos to Defendant in the amount of $5,300.00, which had been introduced previously into evidence.  *Id*. at 434.

Later, Mr. Blow elicited substantial testimony from the Government's money laundering expert, Roy Stewart, that Defendant had filed a 1997 tax return, which he neglected either to review or secure for trial; that gambling can be a legitimate source of income; that putting cash, including gambling winnings, in a safe deposit box, is not illegal; and that Defendant had three "sizable checks from the casinos in Biloxi."  *Id*. at 638, 642-43, & 645.

In his case in chief, Mr. Blow elicited testimony that the $36,000.00 found in a safety deposit box registered to Defendant belonged to Defendant's father, brother, and cousin; that Defendant's father gave Defendant $65,000.00 from the settlement proceeds of a worker's compensation claim; and that Defendant's father gave Defendant the money to purchase one of his cars.  *Id*. at 688-89, 691, 716, 720-22, & 746.

In light of this record evidence, it is clear that Defendant's claim that counsel did not investigate or pursue the defense that Defendant was a gambler and had other legitimate sources to explain moneys in his possession or his lifestyle is factually unsupported, and therefore, is without merit.

In his second claim of ineffectiveness, which is essentially a restatement of the first,

Defendant claims that counsel was ineffective for failing to call his "tax broker...who handled [his] taxes" and Toni Claar, the manager of the apartments where Ms. Hull resided. Doc. 245 at 5-5A. During the Government's case in chief, Mr. Blow advised the Court that he had subpoenaed Richard McKinney, a CPA, and Ms. Claar, but that for "reasons that I have discussed with my client, I would prefer the case in the posture it's in rather than to put those witnesses on." *Id*. at 648-49. Defendant was in full agreement with that decision. *Id*. at 649.

While the Court does not know whether "Richard McKinney" is the same "McKinney" of "Scofield, Scott & McKinney, P.A.," which was listed as the preparer of Defendant's 1997 tax return, if so, it eviscerates Defendant's suggestion that counsel's failure to introduce the tax return was deficient performance. Instead, it was a calculated decision with which Defendant agreed. Furthermore, additional documents showing Defendant had reported "Gambling Winnings" would not have made a difference in the outcome of the proceedings, as there was abundant evidence that Defendant had been successful in his gambling ventures. In addition, Defendant agreed with counsel's decision not to put Ms. Claar on the witness stand. Indeed, the Court cannot quite understand how Ms. Claar's testimony would have been beneficial to him since she would have told the jury that Defendant took an active role in the renting of the apartment ("As Ms. Claar was going over the information regarding the lease...Vincent Smith asked a lot of questions"), that Defendant advised her that he would be in the apartment (though he "would just be visiting"), and that he registered not one, but two vehicles on a "Resident Vehicle Registration Form." Doc. 245, Attach. While Defendant did not, according to Ms. Claar, have any legal responsibility for the apartment or the payment of the rent, *id*., he unquestionably did have a connection to the apartment, and counsel did not act deficiently in

attempting to minimize that connection since it was in Ms. Hull's apartment that the Government found much of the evidence used against Defendant. This claim is likewise without merit.

Finally, Defendant charges that counsel was ineffective for failing to make "all proper objections to all drugs and a few other factors" that should, in his view, have been determined by the jury, not the Court at sentencing. Doc. 245 at 5. As it relates to the enhancement for prior convictions, that issue was raised and decided against him on direct appeal and thus, cannot form the basis of an ineffective assistance claim. *See also United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000), *cert. denied*, 531 U.S. 1131 (2001). Furthermore, to the extent that Defendant is asserting *Blakely/Booker* error, the argument is not well taken, as neither applies to matters on collateral review. *Varela v. United States*, 400 F.3d 864, 868 (11th Cir. 2005).

As to the drug quantities, Larry Washington, Waddie Ming, Steven Ming, Ronnell McKinney, and Thomas Lewis testified that Defendant either bought crack from them or sold crack to them in significant quantities, and it was from these witnesses' testimony that the probation officer reached the conclusion that Defendant was responsible for 722 grams of crack.

Where a defendant has two or more "prior convictions for a felony drug offense" which have become final, he shall be sentenced to a mandatory term of life imprisonment where he is found accountable for "50 grams or more of a mixture or substance...which contains cocaine base." 21 U.S.C. § 841(b)(1)(A). The jury specifically found Defendant guilty of a conspiracy involving "Fifty (50) grams or more of a mixture or substance containing cocaine base, commonly known as 'crack,'" Doc. 165,[3] and Defendant's criminal history shows that he had

---

[3]This special verdict form meets the requirements of the pattern jury instructions for this circuit. *See* Offense Instructions 87, *Eleventh Circuit Pattern Jury Instructions–Criminal* (2003).

two or more prior felony drug convictions.  *See* PSR at 14-17.  This finding by the jury, coupled with Defendant's lengthy criminal drug history, is what garnered him the life sentence, and no amount of arguing to the contrary would have altered the life sentence.

## CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion to vacate, Doc. 245, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this  *13th*  day of July, 2007.

> *s/ A. KORNBLUM*
> **ALLAN KORNBLUM**
> **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**